**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| STEVE MURRAY,<br>Plaintiff<br>v.<br>KENNETH WILLIAMS, et al.,<br>Defendants | Case No.: 3:25-cv-00123-MMD-CSD<br>**Report & Recommendation of United States Magistrate Judge**<br>Re: ECF Nos. 75, 76 |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's second emergency motion for a temporary restraining order (TRO) and preliminary injunction. (ECF Nos. 75, 76, 77.)[1] Defendants filed a response. (ECF Nos. 79, 81-1 to 81-6, 83, 85-1 to 85-6.) Plaintiff filed a reply. (ECF No. 88.)

The court held a hearing on Plaintiff's motion on September 3, 2026, and after a thorough review, it is recommended that the motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 6.) The court screened Plaintiff's complaint and allowed him to proceed with Eighth Amendment deliberate indifference to serious medical needs claims against Dr. Benson, Dr. Voss, Dr. Bijjula,

[1] These docket entries are identical and reflect the different forms of relief sought by Plaintiff (TRO and PI).

Dr. Williams, Director of Nursing (DON) Lucas (subsequently identified as Candis Rambur), DON Isaacson (subsequently identified as Jessica Rambur), Brendal, Michael Bashor (originally named as John Doe 1), Marites Day (originally named as Medekith), Kristina Dodd (originally named as Kris), and John Doe 2.

Plaintiff alleges that he suffers from two types of blood cancer and needs to have his platelet count tested regularly because his cancer treatments can cause his platelet count to increase to extremely high levels that could cause a heart attack or death. He claims Dr. Benson, Dr. Voss, and Dr. Bijjula were responsible for his treatment, and failed to implement procedures to ensure his platelet count would not spike to dangerous levels, and when it did so, they did not provide treatment to reduce his platelet count. Plaintiff filed medical request forms (known as "kites") and grievances notifying Dr. Williams, DON Lucas, and DON Isaacson about these issues, but they failed to order that he receive treatment, despite having the authority to do so. As a result, Plaintiff continued to suffer from dangerously high platelet counts.

Plaintiff further alleges that on June 19, 2024, he had a very high platelet count and also suffered from carbon monoxide poisoning. He sought to "man down" and file an emergency grievance to get medical attention, but Brendal denied his request to "man down" and Bashor denied his emergency grievance. As a result, Plaintiff did not receive medical treatment.

Next, Plaintiff avers that he was prescribed medication to reduce the pain he was in from his cancer, but without reason, John Doe 2 stopped the prescription for 56 days, and Plaintiff experienced severe pain during that time.

Plaintiff asserts that Marites Day and Dodd were notified Plaintiff's blood showed dangerously high platelet levels, and knew Plaintiff could suffer a heart attack or stroke as a

result. Neither took any immediate action to ensure he received treatment, and only told Plaintiff he would be scheduled to see a doctor at a later date.

Finally, Plaintiff alleges that he is 27 pounds underweight. A medical professional prescribed Boost nutritional supplement to help Plaintiff maintain his weight. However, Plaintiff claims Dr. Williams instituted a policy prohibiting prescription protein drinks for inmates unless they have a BMI below 17 percent. As a result, Plaintiff stopped receiving Boost, which caused his health to suffer.

Plaintiff has filed this emergency motion seeking an order that the court order: (1) he be scheduled to be seen by a qualified physician/oncologist immediately; (2) Defendants perform weekly phlebotomies as ordered to determine Plaintiff's platelet count; (3) Plaintiff be provided with a Boost or Ensure or an equivalent nutritional supplement; (4) Plaintiff be prescribed Baclofen or an equivalent medication for his pain; and (5) Plaintiff be scheduled to see a physician to determine a diagnosis and provide treatment of an enlarged growth/tumor in Plaintiff's lower right abdomen.

## II. LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Injunctions and temporary restraining orders are governed procedurally by Federal Rule of Civil Procedure 65, but case law outlines the substantive requirements a party must satisfy to obtain an injunction or restraining order. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,*

*Inc.*, 527 U.S. 308, 319 (1999) ("[T]he general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional principles of equity jurisdiction.").

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted).

The instant motion requires that the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20 (citations omitted).). The Ninth Circuit has held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support the issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (citation and quotation marks omitted).

The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must satisfy additional requirements when seeking preliminary injunctive relief against prison officials. The PLRA provides, in relevant part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2). Thus, the PLRA limits the court's power to grant preliminary injunctive relief to inmates. *See Gilmore v. People of the State of California*, 220 F.3d 987, 998 (9th Cir. 2000). "Section 3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators—no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999.

A temporary restraining order is appropriate when irreparable injury may occur before the court can hold a hearing on a motion for preliminary injunction. *See* 11A The Late Charles Alan Wright & Arthur R. Miller, et. al., *Federal Practice and Procedure*, § 2951 (3d ed. 1999). The standard for issuing a temporary restraining order is identical to the standard for a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *see also* 11A The Late Charles Alan Wright & Arthur R. Miller, et. al., *Federal Practice and Procedure*, § 2951 (3d ed. 1999) ("When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for preliminary injunction and the proceeding is not subject to any special requirements."). A temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 439 (1974).

Moreover, in seeking injunctive relief, "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 636 (9th Cir. 2015). "This requires a sufficient nexus between the claims raised in a motion for injunctive relief and

the claims set forth in the underlying complaint itself." *Id.* "The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). "Absent that relationship or nexus, the district court lacks authority to grant the relief requested." *Id.*

## III. DISCUSSION

### A. Eighth Amendment Deliberate Indifference to Serious Medical Needs

"The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

There is no dispute Plaintiff has a serious medical need as he has been diagnosed with blood cancer. The issue in this action is whether Defendants were deliberately indifferent to his condition. To that end, Plaintiff must show Defendants knew of and disregarded a risk to his health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734

F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**B. Request to be Scheduled with an Oncologist**

Plaintiff saw his oncologist, Dr. Bijjula, on January 6, 2026.

On February 4, 2026, APRN Villegas requested a follow up. (ECF No. 85-1 at 4.)

On March 5, 2026, Dr. Bijjula sent Plaintiff a letter severing the physician-patient relationship, likely because Plaintiff had included Dr. Bijjula in this lawsuit. (ECF No. 77 at 90.)

On March 23, 2026, Plaintiff saw APRN Villegas, and Villegas requested a follow up with a hematologist/oncologist on an *urgent* basis due to Plaintiff's "worsening condition." Plaintiff indicated he could see a Dr. Tay at St. Mary's in Reno. The request for a follow up with a hematologist/oncologist was authorized on April 1, 2026. (ECF No. 85-1 at 2.)

On April 19, 2026, Plaintiff sent a kite asking if he had been scheduled with an oncologist. He was told that his referral was being processed by the Utilization Review Panel (URP), and Plaintiff would be scheduled if the request was approved, even though the request had already been approved for weeks at that point. (ECF No. 85-4 at 11.)

Plaintiff saw a new oncologist, Dr. Katherine Thomas, on July 23, 2026. (ECF No. 117-1.) Insofar as he requests an order that he be scheduled with a new oncologist, his motion should be denied as moot.

**C. Request for Weekly "Phlebotomies" to Determine Plaintiff's Platelet Count**

There appears to be a need to differentiate between a phlebotomy, insofar as that term refers to taking blood for laboratory tests (to find out an individual's red blood count, white blood count, or platelet count, for example), and therapeutic phlebotomy, which involves removing blood as part of the treatment for some blood cancers.[2] Plaintiff's motion appears to refer to the former. Plaintiff's medical records appear to state that therapeutic phlebotomy is not indicated, but there are various orders for phlebotomy for certain lab tests which require a blood draw.

When Plaintiff first saw his oncologist, Dr. Bijjula, he ordered weekly labs to monitor for bone marrow suppression, and included a standing order for CBC (or Complete Blood Count) and CMP (Comprehensive Metabolic Panel). (ECF No. 77 at 26.) When Plaintiff saw Dr. Bijjula on December 12, 2024, he recommended continuing with a CBC every two weeks. (ECF No. 77 at 36.) On August 7, 2025, Dr Bijjula recommended monitoring Plaintiff's CBC every seven days for four weeks, then every 14 days for four weeks, and then monthly. (ECF No. 85-1 at 53.) Dr. Bijjula sent a message on August 11, 2025, however, changing the lab frequency to once a

[2] What Is Therapeutic Phlebotomy?, last visited September 14, 2026.

week. (ECF No. 85-1 at 46.) APRN Villegas' orders regarding labs on August 19, 2025 state, however, that the CBC should be every 7 days for four weeks, every 14 days for four weeks, and then monthly. (ECF No. 85-5 at 15.)

On September 25, 2025, Dr. Bijjula's orders included CBC every 7 days for four weeks, every 14 days for weeks, and then monthly, as well as a monthly CMP. (ECF No. 85-1 at 39-41.) Villegas' order dated October 15, 2025, reflects this as well.

At his last visit with Dr. Bijjula on January 6, 2026, Dr. Bijjula included an order to continue weekly labs for close monitoring. (ECF No. 85-1 at 8.) Villegas' order dated February 3, 2026, also indicates weekly labs, including CBC and CMP. (ECF No. 85-5 at 4.)

Plaintiff provides lab records for most of 2025 (ECF No. 77 at 43-55). Defendants provide a declaration stating that Plaintiff had labs done on December 30, 2025, January 14, 2026, February 5, 2026, February 11, 2026, March 12, 2026, April 1, 2026, May 4, 2026, and June 12, 2026. (Sullivan Decl., ECF No. 102-1 at 3 ¶ 5.)

Dr. Thomas' July 23, 2026 evaluation included an order for standing CBC labs every two weeks. (ECF No. 117-1 at 4.)

Both the records that Plaintiff provided as well as the declaration from Ms. Sullivan reflect that NDOC's medical providers have not been consistently following Plaintiff's treating physicians' orders with respect to blood draws for lab testing.

The court finds that Plaintiff has established, for purposes of this hearing, a likelihood of success on the merits, as well as a likelihood of suffering irreparable harm in the absence of injunctive relief insofar as he claims that that Defendants have failed to monitor his blood in accordance with physician-ordered laboratory testing. Plaintiff has two types of blood cancer, and Defendants do not dispute that monitoring his platelet and other levels is essential to

providing care for his cancer. However, Defendants have not consistently followed those orders, and the court is not convinced that they will continue to follow the current order from Dr. Thomas that Plaintiff have standing CBC labs every two weeks. Such relief is in the public interest, and the balance of hardships weighs in Plaintiff's favor in this regard. As such, it is recommended the court order Plaintiff receive standing CBC labs every two weeks, unless and until Plaintiff's treating oncologist orders otherwise.

**D. Boost or Ensure or Equivalent Nutritional Supplement**

Dr. Bijjula first prescribed Plaintiff Boost nutritional supplement, to be used three times a day for 30 days, with one refill, on August 7, 2025. (ECF No. 88 at 21.) Dr. Villegas included an order for Boost supplement on August 19, 2025. (ECF No. 85-5 at 15.) Dr. Bijjula ordered the Boost supplement against on September 25, 2025, with one refill. (ECF No. 85-1 at 39-41.) On October 15, 2025, APRN Villegas included an order for Boost. (ECF No. 85-5 at 13.)

On December 22, 2025, Plaintiff sent a kite to see a provider noting that his diet needed to be renewed. There is a response that he was seen on December 29, 2025. (ECF No. 85-4 at 37.) Plaintiff sent a kite to see Villegas on December 25, 2025, noting that he had been on a double portion high protein diet for the past year, but it had expired. The response also states Plaintiff was seen on December 29, 2025. (ECF No. 85-4 at 34.)

At Plaintiff's last visit with Dr. Bijjula on January 6, 2026, Dr. Bijjula ordered Boost three times a day with an expiration date of January 6, 2027. (ECF No. 85-1 at 7-8, 14.)

On January 12, 2026, Dr. Tavakoli requested Boost for Plaintiff, noting Plaintiff had recently been seen for moderate protein caloric malnutrition. (ECF No. 85-3 at 10.) Plaintiff sent a kite on January 19, 2026, asking about his high protein diet. The response states that it was ordered on February 3, 2026, and should be active in the next couple of days. (ECF No. 85-4 at

29.) It is not clear whether this refers to Boost or double portion high protein diet. On February 3, 2026, Villegas entered an order to continue Boost PO "tid." (ECF No. 85-5 at 4.)

On July 2, 2026, Plaintiff sent a request to renew his Boost prescription. The individual who responded said she found the order and it appeared it never made it to the URP for review, and she would follow up. (ECF No. 106 at 16.)

On July 23, 2026, Plaintiff's new oncologist, Dr. Thomas, ordered that Plaintiff be provided with "Boost Immune Support," three times a day. (ECF No. 117-1 at 4.) Her records document Plaintiff has had multiple prior infections likely related to immunosuppression. (*Id.*)

In connection with their briefing on this motion, Defendants provide a declaration from Megan Sullivan that says Plaintiff does not qualify for Boost supplement due to his BMI of greater than 18.5. (Sullivan Decl., ECF No. 102-1 at 3-4 ¶ 6.)

At the hearing, Plaintiff explained that Boost was prescribed to strengthen his immune system (in addition to a high protein diet) because he is at risk of infection due to his condition and treatment using oral chemotherapy medications. Dr. Williams, NDOC's Medical Director, who appeared at the hearing on behalf of Defendants, said that Plaintiff's BMI is in the normal range, but the doctor represented that he would work with Plaintiff to get immune support.

Both of Plaintiff's oncologists, as well as NDOC's own providers, have prescribed Plaintiff Boost nutritional supplement, and Plaintiff received the supplement for some period of time. It is documented in Plaintiff's medical records that he suffers from moderate nutritional caloric deficit. It is also documented that Plaintiff has two types of blood cancer and is taking oral cancer medications and suffers from immune suppression. Regardless of Plaintiff's BMI, Dr. Williams did not dispute at the hearing that Plaintiff requires immune support as a result of his diagnosis and treatment regimen.

While there may be a difference of opinion now regarding whether Plaintiff should receive Boost nutritional supplement, Plaintiff has introduced evidence that failing to do so, in the face of multiple orders to the contrary, poses a risk to Plaintiff's health.

On this basis, the court finds Plaintiff has established, at least for purposes of this motion, that he has established a likelihood of success on the merits, a likelihood of suffering irreparable harm in the absence of injunctive relief, and that the relief is in the public interest and the balance of hardships tips in his favor.

As such, the court recommends that Defendants be ordered to provide Plaintiff with Boost Immune Support, as ordered by Dr. Thomas, or to work with Dr. Thomas to find a satisfactory alternative to address the concerns regarding Plaintiff's immune support and nutritional supplementation.

**E. Baclofen or Equivalent for Pain**

Plaintiff consistently complained of pain in his joints to his oncologist, who recommended that he be seen for a consultation with a rheumatologist, and be referred for pain management. (ECF No. 85-1 at 7, 39-41.) Plaintiff was referred for the rheumatology consultation, but it does not appear that he ever saw a rheumatologist. (ECF No. 85-5 at 13.) Defendants provide a declaration from Nurse Megan Sullivan stating that medical staff at NNCC reached out to Carson Tahoe Rheumatology, but it is her understanding that after reviewing his labs, x-rays and provider notes, he did not meet the criteria and they declined to accept him as a patient. (ECF No. 102-1 at 4 ¶ 7.)

Dr. Tavakoli requested an increase of Plaintiff's Tylenol dose for management of chronic pain on December 29, 2025. (ECF No. 85-3 at 12, 85-5 at 7.) In addition to Tylenol, Plaintiff has been prescribed Tramadol and Naproxen. On March 23, 2026, APRN Villegas increased

Plaintiff's dose of Tramadol to see if it would give Plaintiff any functional relief. Villegas also ordered Baclofen for Plaintiff for his chronic pain as Plaintiff reported it helped him in the past. (ECF No. 85-5 at 5; ECF No. 85-3 at 5-6.) Villegas indicated Plaintiff had chronic pain due to his myelofibrosis. (ECF No. 85-3 at 5-6.) It appears that Baclofen was administered between March 24, 2026 and March 31, 2026. (ECF No. 85-3 at 3.) According to Ms. Sullivan, Baclofen is not used for chronic pain relief and is intended for short term muscle spasms and pain, and Plaintiff does not qualify for long term use of Baclofen, which is why he is receiving Tylenol, Naproxen and Tramadol for pain management. (Sullivan Decl., ECF No. 102-1 at 4-5 ¶ 7.)

At his July 23, 2026 oncology appointment, Plaintiff had "diffuse arthralgias/myalgias." (ECF No. 117-1 at 3.) Dr. Thomas adjusted Plaintiff's cancer medications, but there is no order for any additional pain medication. (ECF No. 117-1.)

At the hearing on this matter, Dr. Williams said they were trying to find a rheumatologist for Plaintiff, but it is not unusual to have to wait months to get in to see a rheumatologist, even outside the prison system. He also represented that NDOC providers address the long-term use of medications such as Baclofen on a case-by-case basis, taking into account concerns for diversion and misuse and overprescription.

At this time, Plaintiff has not demonstrated a likelihood of success on the merits as to his Eighth Amendment deliberate indifference claim insofar as his pain treatment is concerned. While Plaintiff has professed a preference for Baclofen over other medication regimens, Plaintiff has been given pain medications in addition to the short-term prescription for Baclofen, including Tylenol, Naproxen and Tramadol. His pain regimen has frequently been adjusted. According to Dr. Williams, the prison is still undertaking efforts to have Plaintiff seen by a rheumatologist, which are constrained by the limited number of professionals in this field as well

as the availability of appointments with these specialists and their willingness to accept inmates as patients. Dr. Williams also assured the court that the prison will work with Plaintiff to address his pain needs. Currently, Plaintiff's oncologist has not recommended additional pain medication to treat Plaintiff's chronic pain. Should this change, prison officials should see to it that Plaintiff's pain is sufficiently managed. The record does not establish Plaintiff will suffer irreparable harm in the absence of injunctive relief. For these reasons, Plaintiff's request for an order that he be provided with Baclofen should be denied.

**F. Growth in Right Lower Abdomen**

Plaintiff is not proceeding in this action with a claim related to a growth in his right lower abdomen, and therefore, the required nexus does not exist between this aspect of Plaintiff's request for injunctive relief and the complaint.

Even if there was a sufficient nexus, Plaintiff's medical records demonstrate that Plaintiff sent a kite to see a provider about swelling in his lower right abdomen on December 24, 2025. (ECF No. 85-4 at 36.) Plaintiff saw Dr. Tavakoli on December 29, 2025, who requested an ultrasound for the right lower abdominal quadrant. (ECF No. 85-1 at 4.) For some reason this did not occur, and on February 18, 2026, APRN Villegas requested an abdominal ultrasound on an urgent basis. (ECF No. 85-1 at 5.) Plaintiff was informed that the ultrasound had been scheduled. (ECF No. 85-4 at 21.) The report from the ultrasound dated February 26, 2026, indicates unremarkable imaging, with no abnormality in the area of the reported growth in the right lower abdominal quadrant. (ECF No. 85-6 at 2-3.) On July 23, 2026, Dr. Thomas ordered another CT of the abdomen/pelvis with contrast to evaluate the right lower quadrant mass. (ECF No. 117-1 at 3.) As of the time of the hearing, that CT had been performed, but NDOC had not yet received

the results. Defendants indicated that they would endeavor to get these results to Plaintiff as soon as possible.

If Plaintiff is still experiencing issues with respect to the growth in the right lower abdominal quadrant, he should kite to be seen by medical. If he does not receive satisfactory treatment, Plaintiff must exhaust administrative remedies before bringing a new lawsuit concerning this claim. Insofar as Plaintiff requests injunctive relief related to the growth in the right lower abdominal quadrant in this action, his motion should be denied.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Plaintiff's motion for injunctive relief (ECF Nos. 75, 76) as follows:

(1) Plaintiff's motion should be **GRANTED** insofar as Defendants should be ordered to perform standing CBC labs every two weeks, in conformity with his treating oncologist's orders or until Plaintiff's treating oncologist orders otherwise;

(2) Plaintiff's motion should be **GRANTED** insofar as Defendants should be ordered to provide Plaintiff with Boost Immune Support, as ordered by Dr. Thomas, or to work with Dr. Thomas to find a satisfactory alternative to address the concerns regarding Plaintiff's immune support and nutritional supplementation.

(3) Plaintiff's motion should be **DENIED** insofar as he requests an order: (A) that he be seen by an oncologist immediately; (B) for Baclofen; (C) for treatment related to the growth in the lower right abdominal quadrant.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge. Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: September 16, 2026

Craig S. Denney
United States Magistrate Judge